<u>**NOT FOR PUBLICATION**</u>

**FILED**

JAMES J. WALDRON, CLERK

**JULY 27, 2009**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  <u>s/ Ronnie Plasner,</u> DEPUTY

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: | Case No.:   05-22983 (DHS) |
| **PELICAN POOL & SKI CENTER, INC.,** | Judge:      Donald H. Steckroth, U.S.B.J. |
| Debtor. | |

<u>**OPINION**</u>

**APPEARANCES:**

Lasser Hochman, L.L.C.
Richard L. Zucker, Esq.
75 Eisenhower Parkway
Roseland, New Jersey 07068
***Counsel for Route 18 Shopping Center Associates***

Trenk DiPasquale Webster DellaFera Sodono
Joseph J. DiPasquale, Esq.
347 Mt. Pleasant Avenue
West Orange, New Jersey  07052
***Counsel for Donald V. Biase, Chapter 7 Trustee***

## THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE

Before the Court are motions for summary judgment. Route 18 Shopping Center Associates (hereinafter "Landlord") filed a motion for summary judgment against Donald Biase as Chapter 7 Trustee for Pelican Pool & Ski Center, Inc. (hereinafter "Trustee" and "Pelican" respectively), seeking: (i) a determination that, effective June 1, 1998, Pelican's *pro rata* share for cost area maintenance charges (hereinafter "CAM") should be calculated at 25.5842%; (ii) an order directing the Trustee to pay the Landlord its outstanding rent, additional rent, and use and occupancy charges incurred after August 22, 2006; and (iii) an order allowing the outstanding Chapter 11 administrative claim of the Landlord.

The Trustee filed a cross-motion for summary judgment seeking: (i) a determination that the lease agreement at issue states unambiguously that Pelican's *pro rata* share for CAM charges was 16.237%; (ii) an order denying in part the Landlord's motion for rent, additional rent, and use and occupancy charges incurred after August 22, 2006; and (iii) an order denying the Landlord's claim for Chapter 11 administrative expenses.

For the reasons stated hereafter, the Landlord's motion for summary judgment is granted in part and denied in part and the Trustee's cross-motion for summary judgment is granted in part and denied in part. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. This matter also constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409. The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## Statement of Facts and Procedural History

**Landlord's Statement of Undisputed Facts**

On December 8, 1989, the Landlord and Pelican entered into a lease agreement for premises located in the Route 18 Shopping Center, the ten-year term of which was to expire on June 30, 2000. *Certification of David Rosen*, ¶¶ 1, 3. The leased premises consisted of approximately 9,760 square feet of retail selling space and 8,107 square feet of basement storage space. *Id.* at ¶ 4. Furthermore, in addition to the payment of base rent, paragraph 7.07 of the lease agreement required Pelican to pay CAM charges based upon a fraction:

> the numerator of which is the number of square feet within the premises demised to Tenant hereunder and the denominator of which is the number of leasable square feet within the entire Shopping Center. . . . For purposes of Common Area Maintenance billing, the numerator will be 9,760 square feet. The denominator will be 77,235 square feet. It is the intention of the parties that Tenant will not pay CAM on the basement square footage. *Id.* at ¶ 5.

*Id.* at ¶ 5. The fraction described in the provision is equal to 0.126368, thereby making Pelican's *pro rata* share for CAM charges, 12.6368%. *Id.* at ¶ 6. Indeed, the Landlord's records regarding its year-end CAM billings reveal that Pelican's *pro rata* share was 12.6368% for at least 1994 and 1996 as well as 12.6367% for 1997. *Id.*

On July 8, 1998, the parties entered into a Lease Modification and Extension Agreement (hereinafter "Modified Lease"), which extended the term of the tenancy and increased the size of Pelican's retail selling space from 9,760 square feet to 19,760 square feet. *Id.*, ¶¶ 7-9. Paragraph 2E of the Modified Lease also replaced paragraph 7.07 of the prior lease agreement with the following.

4

> Tenant shall pay Landlord, as Additional Rental, a common area maintenance charge which shall be the greater of (a) Tenant's *pro rata* share of the total cost of operating and maintaining the common areas and facilities of the Shopping Center, or (b) a minimum charge of One and 55/100 ($1.55) Dollar per square foot of Tenant's Leased Premises per year, which minimum charge shall not be refundable but shall be credited against Tenant's *pro rata* share of the afore-mentioned total cost. The amount of Tenant's minimum charge and the amount of Tenant's *pro rata* share of the aforementioned total costs shall be computed by using a fraction, the numerator of which shall be the square foot area of the Leased Premises and the denominator [of] which shall be the square foot area of the Shopping Center. (Currently your *pro rata* share is 0.16237). Initially Tenant's minimum charge shall be $30,628.00 per annum, which shall be $2,552.34 per month. It is understood that no common area maintenance charges apply to the basement square footage.

*Id.* at ¶ 10.

The Trustee claims that the Landlord over-billed Pelican when it calculated its *pro rata* share at 25.5842%, the percentage equivalent to the fraction, 19,760, the square footage of the leased premises, over 77,235, the square footage of the entire shopping center. *Id.* at ¶ 11. Instead, the Trustee argues that the *pro rata* share should be calculated at 16.237%, or the parenthetical amount set forth in the Modified Lease. *Id.* The Landlord contends it never intended that Pelican's *pro rata* share be anything other than 25.5842%; rather, given the fact that Pelican's *pro rata* share in the Original Lease was 12.637%, it is more likely that the "0.16237" was a typographical error, and the "6" and the "2" were mistakenly reversed. *Id.* Furthermore, the Landlord's calculation of Pelican's ratable share is meant to exclude the square footage of Brunswick Hills, a racquetball club located on the shopping center as broadly defined. *Supplemental Certification of David Rosen*, ¶ 10.

Further documentation exists in support of the fact that Pelican's *pro rata* CAM share was intended to be 25.5842%. *Certification of David Rosen*, ¶ 12. For the seven years ranging from

1998-2005, the CAM recovery bills for Pelican were all calculated and paid at 25.5842% without objection. *Certification of Kelly A. Crozier*, ¶¶ 3-5. Secondly, when contacted by the Landlord regarding its 2000 and 2001 CAM recovery payments, Pelican never contested the fact that its *pro rata* percentage was 25.5842%.[1] *Id.* at ¶¶ 6-11.

On April 20, 2005, an involuntary bankruptcy petition was filed against Pelican under Chapter 7 of the Bankruptcy Code. *Certification of Kelly A. Crozier*, ¶ 12. Pelican contested the petition, and on June 7, 2005, the case was converted to a voluntary Chapter 11 proceeding. *Id.* On January 5, 2006, Pelican filed a motion seeking to assume its unexpired lease with the Landlord. *Route 18 Shopping Ctr. Assocs.' Additional Statement of Material Facts*, ¶ 30. The director of property management for the Landlord, Kelly A. Crozier, filed a certification in response to the motion in which she explained that the Landlord had no objection to Pelicans's assumption of the lease so long as it cured all existing defaults, compensated the Landlord for pecuniary losses, and provided adequate assurance. *Id.* at ¶ 31. Indeed, according to Crozier's certification, Pelican was in default with respect to the 2004 CAM adjustment billed on April 22, 2005. *Id.* at ¶ 32. She also noted that Pelican's *pro rata* share of CAM charges was 25.5842%. *Id.* The Debtor did not object to the CAM allocation. *Id.*

The case was converted to a Chapter 7 proceeding and the Trustee was appointed. *Certification of Kelly A. Crozier*, ¶ 14. Subsequent to an auction sale at Pelican's leased premises,

---

[1] Pelican failed to make its 2000 CAM recovery payment and was accordingly contacted by the Landlord regarding this non-payment. *Certification of Kelly A. Crozier*, ¶ 6. Pelican expressed frustration with the amount of CAM charges, but did not challenge its *pro rata* share. *Id.* As Pelican had still not paid the balance of the 2000 CAM recovery by February of 2002, the Landlord brought an eviction action in the Superior Court of New Jersey. *Id.* at ¶ 7. Pelican then sent the Landlord a letter in which it recognized that its *pro rata* CAM share was 25.5842%, and the matter was eventually settled in a manner that accounted for that percentage. *Id.*

6

the Trustee filed a motion to reject the unexpired lease, which was granted effective September 29, 2006. *Id.*

Between his appointment and the rejection of the lease, the Trustee incurred administrative expenses totaling $40,299.70. *Id.* at ¶ 15. The Landlord seeks allowance of its unpaid Chapter 11 administration expenses, which amount to $142,464.76. *Id.* at ¶ 17. Furthermore, because estate assets remained on the premises after the effective lease rejection date, the Trustee incurred post-rejection administration expenses, totaling $81,214.33. *Id.* at ¶ 16. Photographs of the premises taken on June 4, 2007 reveal that debris and estate assets continue to be stored at the demised premises. *Route 18 Shopping Ctr. Assocs.' Additional Statement of Material Facts*, ¶¶ 43-45. The Trustee was twice notified that items belonging to the estate needed to be removed from the premises. *Id.* at ¶ 46. Also, the Landlord's proof of claim includes necessary repairs to the demised premises in the amount of $8,626.50. *Id.* at ¶ 47.

Beginning in January of 2006, the Landlord retained counsel to assist in collecting then-existing unpaid rent and additional rent. *Id.* at ¶ 38. Counsel filed a motion to compel payment of post-petition rent in the amount of $182,106.82. *Id.* at ¶ 40. This motion was opposed by the Chapter 11 trustee. The Court entered an Order directing the Trustee to pay the Landlord in the amount of $71,054.32. *Id.* That amount was subsequently amended to $65,874.39.

**Trustee+'s Disputed and Additional Facts**

On August 21, 2006, the Trustee shut down Pelican's operations. *Trustee's Statement of Undisputed Facts*, ¶ 8. Following the auction sale conducted at the premises on September 26, 2006, the Trustee personally removed the debris left on the premises to a nearby dumpster, and any

other debris leftover was carted away. *Certification of Donald V. Biase*, ¶ 11.  Indeed, by the effective date of rejection, the only items left on the premises were shelving units affixed to the walls and possibly to the floor, all of which the Trustee was hesitant to remove due to concerns of damage to the premises.  *Id.* at ¶¶ 12-13.  These remaining items offered no value to the bankruptcy estate and thus, the Trustee did not utilize the premises during the post-rejection period for "storage" of estate assets.  *Id.* at ¶ 14.  The estate derived no benefit from the remaining fixtures or shelving during the post-rejection period, and because the Trustee was never notified by the Landlord that any of Pelican's items needed to be removed, charges borne in removing such items should not constitute an administrative expense.  *Id.* at ¶¶ 15-16.

Pelican's *pro rata* share as set forth in the parties' Original Lease agreement was 0.12636.  *Trustee's Statement of Undisputed Facts*, ¶ 11.  Paragraph 2E of the Modified Lease defines Pelican's *pro rata* CAM share to be 0.16237.  *Certification of Timothy J. King in Support of Trustee's Cross-Motion*, ¶ 13.  Pelican was not aware of its *pro rata* share of 25.5842% until the CAM recovery reconciliation was produced by the Landlord during the first quarter of the following year.  *Id.* at ¶ 15.  Moreover, the Landlord's calculation of Pelican's *pro rata* share excludes the square footage of Brunswick Hills, or 43,836 square feet,[2] and which should have been included in the denominator for the CAM calculation since the facility is reflected in the site plan of the shopping center.  *Id.* at ¶ 17.  As a result of this error, Pelican overpaid its CAM fees to the Landlord in the amount of $102,813.97 for the years 2000 to 2004.  *Id.* at ¶¶ 17-18.  The CAM charges for

---

[2] The Landlord disputes the contention that the square footage of the racquetball club is 43,836 square feet. Rather, according to the ground lease for the racquetball club, the square footage is 43,800.

the period August 22, 2006 to September 20, 2006 are erroneous for the same reasons. *Id.* at ¶¶ 18-19.

On August 21, 2006, the Trustee filed opposition to the Landlord's motion to compel payment of post-petition rent, explaining that he did not have all of the information needed to determine the validity of the Landlord's claim. *Trustee's Statement of Undisputed Facts,* ¶ 17. In its Amended Order entered on October 19, 2006, the Court required payment to the Landlord in the amount of $65, 874.39 and deemed the following as contested matters under Rule 9014: (i) a claim for real estate taxes (hereinafter "RET") and CAM charges billed between April 20, 2005 and June 7, 2005, as well as those billed after June 7, 2005; (ii) post-petition rejection claims for damages as well as for use and occupancy of the leased premises; (iii) rental payments due as of April 20, 2005; (iv) claims for termination damages resulting from the rejection of the lease; and (v) claims against the Landlord for overpaid CAM charges. *Id.* at ¶ 22. On December 12, 2006, the Landlord filed a proof of claim for its Chapter 7 and Chapter 11 administrative expenses, as well as for termination damages, totaling $696,380.63. *Id.* at ¶ 24.

In March of 2007, the Trustee deposed Kelly Crozier and David Rosen, both employees of the Landlord's management company. *Id.* at ¶ 25. At Ms. Crozier's deposition, she acknowledged that the Route 18 Shopping Center consists of two buildings, one of which being the racquetball club, and indicated that Mr. Rosen negotiated the Modified Lease. *Id.* at ¶¶ 26-7. At Mr. Rosen's deposition, he admitted that, in calculating Pelican's *pro rata* CAM share, the denominator is equal to the square footage of the entire shopping center, though he could not recall whether he considered the shopping center's expansion over time when negotiating the agreement. *Id.* at ¶ 28.

**Discussion**

**I.      Summary Judgment Standard**

A court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made

applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  *Id.*  At the summary judgment stage, the role of

the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial."

*Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986)).  The court must construe facts and inferences in a light most favorable

to the non-moving party.  *See Am. Marine Rail NJ, LLC v. City of Bayonne*, 289 F. Supp. 2d 569,

578 (D.N.J. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

587-88 (1986)).  "Only evidence admissible at trial may be used to test a summary judgment motion.

Thus evidence whose foundation is deficient must be excluded from consideration."  *Williams v.*

*Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989) (citations omitted).

The moving party must make an initial showing that there is no genuine issue of material

fact.  *See Knauss*, 289 F. Supp. 2d at 549 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The burden then shifts to the non-moving party to "'make a showing sufficient to establish the

existence of [every] element essential to the party's case, and on which that party will bear the

burden of proof at trial.'"  *Cardenas v. Massey*, 269 F.3d 251, 254-55 (3d Cir. 2001) (questioned

on other grounds) (quoting *Celotex Corp.*, 477 U.S. at 322).  The "mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

10

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*,

477 U.S. at 247-48 (emphasis in original).  An issue of fact is "genuine" if a reasonable juror could

return a verdict for the non-moving party.  *See id.* at 248.  Furthermore, a material fact is determined

by the substantive law at issue.  *See Crane v. Yurick*, 287 F. Supp. 2d 553, 556 (D.N.J. 2003) (citing

*Anderson*, 477 U.S. at 248).  A fact is "material" if it might affect the outcome of the suit under

governing law.  *Id.*  Disputes over irrelevant or unnecessary facts are insufficient to defeat a motion

for summary judgment.  *Anderson*, 477 U.S. at 248 (citation omitted).

However, even if material facts remain disputed, summary judgment may be proper if, after

all inferences are drawn in the non-moving party's favor, the moving party is entitled to judgment

as a matter of law.  *Id.* at 248-50.  Such a judgment is appropriate "as a matter of law" when the

non-moving party has failed to make an adequate showing on an essential element of his or her case,

as to which he or she has the burden of proof.  *See Celotex Corp.*, 477 U.S. at 322-23.  When one

party motions the court for summary judgment, Federal Rules of Civil Procedure 54(c) and 56, taken

together, permit the court to enter summary judgment on behalf of the non-movant, even if the

non-movant has not filed a cross-motion for summary judgment.  *See Peiffer v. Lebanon School

Dist.*, 673 F. Supp. 147, 151-*52 (M.D. Pa. 1987) (citation omitted).  On the other hand, a court

must deny a motion for summary judgment when a genuine issue of material fact remains to be tried,

or where the moving party is not entitled to a judgment as a matter of law.

11

II.    *Pro Rata* **Share of CAM Charges**

    A.    **Admissibility of Extrinsic Evidence**

When interpreting a contract, a court's primary purpose is to determine the objective intent of the parties at the time of the creation of the contract. *N. River Ins. Co. v. Combustion Eng'g, Inc. (In re Combustion Eng'g, Inc.*), 366 F. Supp. 2d 224, 229 (D.N.J. 2005).  In carrying out this task, courts must examine the document as a whole and should not torture the language of the contract to create an ambiguity. *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002) (citing *Stiefel v. Bayley, Martin & Fay, Inc.*, 577 A.2d 1303 (N.J. Super. Ct. App. Div. 1990)). When determining whether a contract's language is ambiguous, the Third Circuit adheres to a relaxed version of the traditional "four corners" approach, permitting consideration not only of the language of the contract, but also the circumstances surrounding the making of the contract, including: (i) the bargaining history of the parties; (ii) the motives of the parties when entering into the contract, and (iii) any conduct undertaken that reflects the parties' understanding of the its meaning. *See Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006).

An ambiguity in a contract will exist if the terms of the contract are susceptible to at least two reasonable alternative interpretations. *E.g.*, *M.J. Paquet, Inc. v. N.J. Dept. of Transp.*, 794 A.2d 141, 152 (N.J. 2002); *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997). Where a term is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning. *Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley)*, 89 F.3d 143, 150 (3d Cir. 1996) (applying New Jersey law). Where a written contract is unambiguous,

however, the parol evidence rule[3] can operate to bar extrinsic evidence, since it is only after the

meaning of a contract is discerned that the parol evidence rule comes into play. *Conway*, 901 A.2d

at 347; *see also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001 (3d Cir. 1980)

(applying Pennsylvania law).  Accordingly, even though the parol evidence rule excludes evidence

that varies or contradicts the terms of a fully-integrated agreement,[4]  it does not exclude evidence

offered for the purpose of interpreting and giving meaning to those terms. *Conway*, 901 A.2d at 347.

Furthermore, the issue of ambiguity must be carefully distinguished from the issue of integration,

since issues of integration arise only when evidence is introduced to vary or add to the terms of an

unambiguous contract on grounds that the written contract is not fully integrated. *Mellon Bank*, 619

F.2d at 1010.

      In the present case, the primary question is whether paragraph 2E of the Modified Lease is

ambiguous.  The Trustee claims that the Modified Lease is unambiguous in establishing Pelican's

*pro rata* share to be 16.237%.  This Court disagrees.  No rational mathematical basis is offered to

support the Trustee's position.  Rather, the provision of the Modified Lease is latently ambiguous

with respect to Pelican's intended *pro rata* share for CAM expenses, and thus extrinsic evidence

should be admissible for the purposes of resolving this ambiguity.  *See Franklin K. Pearce Co. v.*

---

[3] The parol evidence rule provides that, "when two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understanding and negotiations will not be admitted for the purpose of varying or contradicting the writing." *U.S. v. Clementon Sewerage Auth.*, 365 F.2d 609, 613 (3d Cir. 1966).

[4] An agreement is "integrated" where the parties thereto adopted a writing or writings as the final and complete expression of the agreement. *Clementon Sewerage Auth.*, 365 F.2d at 613. Extrinsic evidence, including the conduct and language of the parties and the surrounding circumstances, is admissible in order to determine whether the agreement is integrated. *Atl. N. Airlines, Inc. v. Schwimmer*, 96 A.2d 652, 657 (N.J. 1953). Here, there is no dispute that the Modified Lease is fully integrated as  Section 23.05 contains a comprehensive merger clause. There is also no dispute as to the fact that an agreement exists between the parties; rather, the issue at hand turns on the proper interpretations of the terms of the agreement.

*Beverly Beach, Inc.*, 150 A. 399, 400 (N.J. 1930) (explaining that a latent ambiguity is one not appearing on the face of the instrument but existing irrespective thereof, and which may be the subject of explanation of parol evidence and consideration of a jury); *Schor*, 814 A.2d at 192 ("when in the context of the document itself and the transaction to which it pertains, the terminology employed, despite a facile simplicity, actually is not free from doubt as to its meaning, the party is permitted to introduce proof of extrinsic circumstances bearing on the alleged proper interpretation of the language used").

First, because the Modified Lease is missing a key exhibit, it is unclear as to what the parties were envisioning when they agreed that "the number of leasable square feet within the entire Shopping Center" would be used as the denominator for calculating Pelican's CAM expenses.  *See Certification of David Rosen, Exhibit H*.  Indeed, the lease defines the "Shopping Center" as the "land described in Exhibit A and the improvements situated thereon as depicted on Exhibit B. . . ." *Id.*.  However, Exhibit A was not made part of the lease.  As a result, one cannot be sure whether, for purposes of calculating CAM expenses, the "Shopping Center" was meant to include the racquetball club, since Exhibit A could very well have depicted the land used for the strip mall only. This Court cannot assume that the inclusion of the racquetball club in Exhibit B, which depicts the improvements on the Landlord's property, is sufficient to prove that the racquetball club was meant to be included as part of the "Shopping Center" for purposes of calculating Pelican's CAM allocation.

Secondly, while the Modified Lease states that the denominator should reflect the "number of leasable square feet within the entire Shopping Center," it does not set forth a particular square footage to be calculated as the denominator as the Original Lease did.  As a result, the Landlord and

14

the Trustee have offered differing explanations as to what the denominator was intended to be. According to the Landlord, there was never any intent by either party to alter the denominator of 77,235 square feet under the Original Lease when executing the Modified Lease. The Trustee interprets the definition of the "Shopping Center" as including the racquetball club, and contends that the denominator should be the equivalent of the square footage of the strip mall plus the square footage of the racquetball club, for a total of 121,070 square feet.

Furthermore, the Modified Lease is ambiguous as to the significance of the phrase, "[c]urrently your *pro rata* share is 0.16237," particularly when considering the fact that neither denominator proposed by the parties for calculating Pelican's CAM allocation results in a *pro rata* share of 0.16237. The fraction proposed by the Trustee for calculating the CAM allocation, 19,760 over 121,070, equals 0.16321, and thus does not correspond with the figure set forth in the lease provision or the figure argued by the Trustee. The Landlord logically explains that the phrase "[c]urrently your *pro rata* share is 0.16237" was meant to refer to Pelican's *pro rata* share prior to the effective date of the Modified Lease, or 12.637%, and the "6" and the "2" were mistakenly swapped through typographical error. Thus, the phrase was not meant to have any bearing on the new calculation of Pelican's CAM allocation under the Modified Lease; rather, it was meant to represent the CAM allocation under the Original Lease.

In light of the foregoing, extrinsic evidence is admissible to determine the intended meaning of the CAM charges set forth in the Modified Lease provision.

### B.    Proper Calculation for Pelican's *Pro Rata* CAM Share

This Court will consider extrinsic evidence in a manner that reflects the objective intent of the parties at the time the agreement was made. *In re New Valley Corp.*, 89 F.3d at 150. The

Landlord has offered considerable evidence demonstrating that Pelican's CAM billings for the seven years following the execution of the Modified Lease were calculated at a rate of 25.5842% without objection. Such continuity evidences a course of conduct between the parties and suggests that both parties intended and understood the *pro rata* share to be calculated using that percentage when the contract was formed. *See In re Teamsters Indus. Employees Welfare Fund*, 989 F.2d 132,137 (3d Cir. 1993) (applying New Jersey law) ("[e]vidence of a course of conduct is particularly compelling when it occurs over a substantial time period."); *Quick v. N.L.R.B.*, 245 F.3d 231, 247 (3d Cir. 2001) ("where an agreement involves repeated occasions for performance by either party with knowledge of the performance and opportunity for objection to it by the other, any cause of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement").

Furthermore, the depositions of David Rosen and Kelly Crozier provide additional support for the contention that both parties intended the *pro rata* expenses to be calculated at 25.5842%. During Mr. Rosen's deposition, he testified that Pelican's CAM allocation was never charged at a rate of 16.237%; rather, the presence of that figure in the Modified Lease was purely a "mathematical mistake." *Rosen Dep.* 31:10-11. He also testified that the denominator of the fraction used to calculate Pelican's CAM charges was always intended by both parties to remain unchanged under the Modified Lease. *Id.* at 65:23-25 - 66:1-3. After all, when considering the fact that Pelican doubled the square footage of the leased premises under the Modified Lease, it is reasonable that Pelican's CAM percentage would also double to reach approximately 25.5842%. *Id.* at 31:11-15.

Ms. Crozier testified that the square footage of the racquetball club was not included in the denominator of the CAM allocation, and the fraction intended to be used by the parties consisted

16

of 19,760 as the numerator and 77,235 as the denominator. *Crozier Dep.* 45:19-22. Thus, although the square footage of the strip mall and the racquetball club was likely larger than 120,000 square feet, *for purposes of CAM*, the square footage of leasable area was considered to be 77,235 under the Modified Lease. *Id.* at 69:2-9.

The Trustee's evidence on this issue is minimal at best. The Trustee recites the Modified Lease provision of 16.237% and provides a certification from his own accountant offering a calculation of CAM charges expressly based upon this assumption. Significantly, the Trustee has offered no deposition or certification from Pelican's principals or other persons with firsthand knowledge of the lease negotiations or provisions in order to demonstrate that the intended percentage was 16.237%, or at the very least, something other than 25.5842%. In addition, although the Trustee points to two exhibits which show that Pelican had questioned the amount of its CAM charges, the evidence reveals that Pelican never once objected to the *percentage* used to calculate its ratable share, and thus these exhibits do not support the Trustee's claim.

This Court therefore determines the CAM charges in the Modified Lease to be 25.5842% and grants summary judgment for the Landlord on this issue.

## III.    Post-Rejection Use and Occupancy Charges as an Administrative Expense Priority

The Landlord alleges that following the rejection of the lease, the Debtor remained in possession of the premises until November of 2006, causing the Landlord to incur expenses for rent, RET, CAM charges, and repairs. As a result, the Landlord seeks post-rejection use and occupancy charges as an administrative expense priority, predicating its entitlement to these charges on the Court's reasoning in *Cornwall. In re Cornwall Paper Mills Co.*, 169 B.R. 844, 847 (Bankr. D.N.J. 1994) (hereinafter "*Cornwall*"). In *Cornwall*, a landlord similarly sought to compel a Chapter 11

debtor to pay administrative post-rejection rents pursuant to Section 503(b)(1)(A)[5] of the Bankruptcy Code. *Id.* In addition, although the debtor claimed to have vacated the premises, it was not until two years later and following the completion of two private sales of the debtor's assets that the rest of the debtor's office furnishings were removed from the premises. *Id.* at 847. Thus, even though the Court questioned whether the debtor should be accountable for rents following the sale, it held that the landlord was entitled to an administrative priority claim for post-petition rent as an actual and necessary cost of preserving the estate. *Id.* at 851 (citing *Zagata Fabricators v. Superior Air Prod.*, 893 F.3d 624, 627 (3d Cir. 1990) ("[R]ent is clearly an 'actual, necessary' cost of preserving the estate, since the debtor's survival depends on its ability to pay the landlord for the right to possess the space necessary to conduct its business.")).

In determining the amount of rent that the landlord was entitled to receive as an administrative priority, the Court employed an "objective approach," under which a lessor is entitled to collect the fair rental value of the leased premises so long as the debtor is occupying the leased property. *Id.* The Court also explained that a debtor could be considered to be occupying the premises and thus accountable for paying rent where it used the property for storage or for a purpose different than the pre-petition use. *Id.* (citing *In re F.A. Potts & Co., Inc.*, 137 B.R. 13, 17 (E.D. Pa. 1992)). "[T]he rental value fixed in the lease will control unless there is convincing evidence that such rental rate is unreasonable." *Id.*

Here, even though most of Pelican's assets were removed from the premises following the lease rejection date, Pelican could still be required to pay use and occupancy charges to the Landlord

---

[5] Section 503(b)(1)(A) of the Bankruptcy Code provides: "After notice and a hearing, there shall be allowed administrative expenses . . . including -- (1)(A) the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

18

if the amount of estate assets on the premises was such as to warrant payment of rent and other

charges. The Trustee argues that *Cornwall* is distinguishable from the instant matter since the items

remaining on the premises following Pelican's departure were of inconsequential value, and thus

their presence on the premises was neither a benefit to Pelican's estate nor a necessary cost of

preserving the estate under Section 503(b)(1)(A) of the Bankruptcy Code. *Certification of Donald*

*V. Biase*, ¶¶ 14, 16. The Trustee certifies that he personally removed debris from the premises and

that the only items remaining after the lease rejection date were shelving units affixed to the walls

and possibly the floor. *Id.* at ¶¶ 11-12.  The Trustee did not remove the shelving as he believed that

removal would cause damage to the premises.[6] *Id.* at ¶ 13.

Photographs offered by the Landlord demonstrate the existence of other items in addition to

the shelving units on the premises following Pelican's departure, including debris and piping.  These

photographs, allegedly taken on June 4, 2007, are purportedly an accurate depiction of how the

premises were left following rejection of the lease since the items are claimed to have remained on

---

[6] The contention that the shelving units were affixed to the premises raises the possibility that they can be considered fixtures, and thus property of the Landlord. *See Handler v. Horns*, 65 A.2d 523, 526 (N.J. 1949); *In re Park Corrogated Box Corp.*, 249 F. Supp. 56, 58 (D.N.J. 1966) (applying New Jersey law).  A chattel may be regarded as a "trade fixture" if it is annexed to the demised premises for the purpose of aiding a tenant in the exercise of a trade or business for pecuniary profit. *Handler*, 65 A.2d at 526.  In the absence of an agreement to the contrary, a tenant may remove trade fixtures so long as such fixtures can be severed from the premises without material injury thereto. *Handler* 65 A.2d at 526.  However, if a tenant fails to remove such fixtures within a reasonable time after the termination of a lease, the fixtures are considered abandoned and become part of the property. *Sgro v. Getty Petroleum Corp.*, 854 F. Supp. 1164, 1181 (D.N.J. 1994) (applying New Jersey law).  Here, the Trustee certifies that the shelving units are in fact affixed to the premises and would cause material damage upon removal.  The affixation of the shelving is also evidence of Pelican's intent to accede it to the property. Furthermore, the lease as modified specifies that, where Pelican failed to remove fixtures from the premises within fourteen days after termination of the lease without objection from the Landlord, the fixtures were to become property of the Landlord. *See Certification of David Rosen, Exhibit A.*  In light of this lease provision, as well as the assertion that the shelving was affixed by Pelican and cannot be removed without causing material damage to the premises, the shelving constitutes a fixture belonging to the Landlord. *See Handler*, 65 A.2d at 526.  As a result, although the Landlord's proof of claim seeks amounts for repairs to the premises, albeit in a conclusory and non-descriptive manner, the Landlord cannot be heard to complain of damages caused by any removal of the shelving units as they constitute its property under New Jersey law.

19

the premises.  However, the pictures are dated almost eight months since rejection was granted.  In

addition, the pictures neglect to specify which of the items depicted are the estate assets left by

Pelican at the time it vacated the premises, and which items may have that accumulated on the

premises since rejection.[7]  As a result, the photographs are of little value in proving whether Pelican

used the premises as storage following the Order of rejection.

This Court is faced with a situation where, in the light most favorable to the Trustee,

substantially all of the Debtor's property was removed from the premises as of the Order of

rejection, and in the light most favorable to the Landlord, the Debtor failed to remove its assets from

the premises.  Accordingly, issues of fact exist and summary judgment must be denied.

## IV.    Payment of Chapter 7 Expenses and Interest

The Landlord seeks payment for expenses it incurred between appointment of the Trustee

and rejection of the lease[8] as an administrative expense priority.  The expenses sought include rent

and RET due as of September 1, 2006, CAM charges for August 22, 2006 through

September 29, 2006, and interest that has accrued on these unpaid lease obligations since

September 1, 2006. The Trustee does not object to the payment of rent or RET, and accordingly

summary judgment issues in favor of the Landlord as to those charges.  However, the Trustee does

---

[7] The pictures do raises questions as to the Landlord's charges for repairs to the premises following
Pelican's departure.  Indeed, if a large amount of debris resulting continues to remain on the premises, one must
wonder how the Landlord can justify its costly expenditures for clearing and cleaning the premises.  Furthermore,
the Trustee argues that the clean-up charge sought by the Landlord is a post-rejection expense that did not benefit the
estate and thus can only be afforded pre-petition unsecured status pursuant to Section 365(g) of the Bankruptcy
Code.  Because genuine issues of fact exist favorable to each party, the Court cannot yet determine whether a
sufficient amount of estate assets remained on the premises so as to make rent payments and cleaning costs a benefit
to the estate entitled to administrative expense priority under Section 503(b)(1)(A).

[8] Because the interest on Pelican's unpaid lease obligations began to accrue upon the date which such
obligations were due pursuant to section 4.09 of the lease as modified, the $3,327.50 in interest sought by the
Landlord reflects the interest accruing on the unpaid lease obligations from September 1, 2006 through
May 31, 2007.  *Landlord's Letter Mem. in Reply to Trustee's Opposition*, page 16.  Thereafter, interest accrued
at a rate of $12.16 per diem until the lease obligations are paid.  *Id.*

object to payment of CAM charges and the interest sought by the Landlord as an administrative expense.

First, with respect to the CAM charges, the Trustee argues that the charge is erroneous because it should have been calculated using 16.237% as Pelican's *pro rata* share for CAM expenses. This Court has already determined that, as a matter of law, Pelican's *pro rata* share for CAM expenses is 25.5842% under the Modified Lease. Thus, summary judgment is granted in favor of the Landlord as to the CAM charges.

The next issue -- whether the Landlord is entitled to the interest that accrued on Pelican's unpaid lease obligations as an administrative expense -- must be bifurcated. First, the Court will determine whether the Landlord is entitled to the interest that accrued on the unpaid lease obligations following the petition date and prior to the lease rejection date. Next, the Court will examine whether the Landlord is entitled to interest that has continued to accrue since the effective date of rejection.

### A.    Post-Petition and Pre-Rejection Interest on Unpaid Lease Obligations

Section 365(d)(3) of the Bankruptcy Code requires a trustee to timely perform the obligations of the debtor under any unexpired lease of nonresidential real property until assumption or rejection. In other words, if the obligations under the lease become due following the petition date and prior to the rejection of the lease, the obligations are payable immediately. *See Centerpoint Props. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward*), 268 F.3d 205, 211 (3d Cir. 2001) (hereinafter "*Montgomery Ward*"); *Omni Partners, L.P. v. Pudgie's Dev. of N.Y., Inc.* (*In re Pudgie's Dev. of N.Y., Inc.*), 239 B.R. 688, 694 (S.D.N.Y. 1999).

The issue in the present case is whether the Landlord is entitled to post-petition and pre-rejection interest that accrued on Pelican's unpaid lease obligations. It is worth noting that just because Section 365(d)(3) of the Bankruptcy Code may require a trustee to pay post-petition, pre-rejection rent to a landlord as it becomes due, it does not necessarily follow that the failure to make timely payments of rent gives rise to a claim for interest. *E.g.*, *In re Geonex Corp.*, 258 B.R. 336, 342-43 (Bankr. D. Md. 2001) (hereinafter "*Geonex*"). Indeed, while courts have frequently addressed the question of whether a Landlord is entitled to rent, fewer courts have addressed the precise question of whether interest can be afforded administrative expense priority under Section 365(d)(3).

In *Geonex*, applying Pennsylvania law, the court determined that a landlord was not only entitled to an administrative claim under Section 365(d)(3) for post-petition but pre-rejection rent, but to the interest accruing on such unpaid rent as well. *Geonex*, 258 B.R. at 343. Even though the lease was silent as to whether interest was allowable for unpaid rent charges, the court found that Pennsylvania law provided a basis for awarding interest because the state had adopted the Restatement of Contracts, which allowed interest on unpaid lease obligations. *Id.* The Restatement of Contracts § 337(a), as cited in *Geonex*, may be found without substantive revision in Restatement Second of Contracts § 354, which states:

> (1)    If the breach consists of a failure to pay a definite sum of money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2)    In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

RESTATEMENT (SECOND) OF CONTRACTS § 354 (1981).  The State of New Jersey has adopted the

original Restatement of Contracts provision.  *See Hoelzel v. Gavalas*, 52 A.2d 54, 54-55 (N.J. 1947);

*Deerhurst Estates v. Meadow Homes, Inc.*, 165 A.2d 543, 554 (N.J. Super. Ct. App. Div. 1961).

Given the lack of substantive revision of the Restatement provision, the rent, CAM charges, and

RET sought constitutes a "definite sum of money with a fixed or ascertainable value," and interest

may  be recoverable.

In addition, other courts have placed considerable weight upon the existence of a contract

allowing for a landlord's collection of interest in justifying the decision to include interest as an

administrative expense.  *See In re MUMA Servs., Inc.*, 279 B.R. 478, 487-89 (Bankr. D. Del. 2002)

(finding that, in light of the similarities between Section 365(d)(3) and 365(d)(10), as well as the

reasoning in *Montgomery Ward*, a lessor is entitled to an administrative expense under Section

365(d)(10) for any charge in a lease enforceable under state law);  *In re MS Freight Distribution,

Inc.*, 172 B.R. 976, 979 (Bankr. W.D. Wash. 1994) (holding that, to the extent the lease at issue

required the payment of interest, late fees and attorneys fees and costs, the lessor could recover such

amounts).  Here, Section 4.09 of lease as modified requires payment of interest or additional rent

under a ten-day default provision.  Accordingly, this Court holds that, pursuant to the applicable

provisions of the Modified Lease and the reasoning in *Montgomery Ward,* the Landlord shall be

entitled to interest on its post-petition and pre-rejection lease obligations pursuant to Section

365(d)(3) of the Bankruptcy Code.

### B.      Post-Petition and Post-Rejection Interest on Unpaid Lease Obligations

Section 365(g)(1) of the Bankruptcy Code states that rejection of a debtor's unexpired

lease constitutes a breach of the lease as of the time immediately before the petition filing.  *See*

11 U.S.C. § 365(g)(1); *Sharon Steel Corp.*, 872 F.2d 36 (3d Cir. 1989). Here, the Landlord is seeking the payment of interest that has continued to accrue on Pelican's unpaid rental, CAM, and RET charges since the effective date of rejection. Because the interest on these lease obligations arose post-rejection, the claim is typically treated as a pre-petition, general unsecured claim unless it meets the criteria for priority as an administrative claim under Section 503(b)(1)(A) of the Bankruptcy Code. *In re Chi Chi's, Inc.*, 305 B.R. 396, 400 (Bankr. D. Del. 2004) (explaining that where a lease obligation becomes due pre-petition or post-rejection, it will be part of a landlord's unsecured claim). To be given priority as an administrative expense under Section 503(b)(1)(A): (i) the claim must arise from a transaction with the debtor; and (ii) consideration supporting claimant's right to payment must have been supplied to and been a benefit to the debtor's estate. *In re The Grand Union Co.*, 266 B.R. 621, 628 (Bankr. D.N.J. 2001).

In the instant matter, the Landlord has failed to demonstrate that the payment of interest as an administrative expense after the lease rejection date would benefit Pelican's estate. Accordingly, the Landlord's request for post-rejection interest as an administrative expense is denied and summary judgment is granted in favor of the Trustee with respect to this issue.

## V.    Allowance of Chapter 11 Administrative Claim

Section 365(d)(3) of the Bankruptcy Code requires a trustee to timely perform the obligations of the debtor until rejection. In *Montgomery Ward*, the Third Circuit interpreted this provision as requiring that a landlord be reimbursed in full for tax payments that were billed post-petition, but which accrued pre-petition. *In re Montgomery Ward*, 268 F.3d at 211. ("[A]n obligation arises under a lease for purposes of § 365(d)(3) when the legally enforceable duty to perform arises under that lease."). As the Third Circuit Court of Appeals adopted the billing date approach, and because

the language of the lease provisions at issue in *Montgomery Ward* stated that an obligation to pay

taxes to the landlord would arise upon billing, the Court found that the invoices, received post-

petition but pre-rejection, gave rise to an administrative expense claim.  *Id.* at 211.

In the present case, the Landlord seeks allowance of the following Chapter 11 expenses:

(i) CAM charges for the period ranging from January 1, 2006 to August 22, 2006; (ii) RET from

January 1, 2006 to June 30, 2006; (iii) the 2005 CAM reconciliation, billed June 2, 2006; (iv) the

2005 RET reconciliation, billed June 2, 2006; (v) the balance of the CAM reconciliation for the year

2004, billed April 22, 2005; and (vi) the 2004 RET reconciliation, billed April 22, 2005.   In

response, the Trustee argues that some of these expenses cannot be classified as administrative

because they arose pre-petition.  Accordingly, in order to assure that the expenses sought by the

Landlord arose post-petition, it is necessary to identify the petition date.

Section 348(a) of the Bankruptcy Code provides as follows.

> Conversion of a case from a case under one chapter of this title to a
> case under another chapter of this title constitutes an order for relief
> under the chapter to which the case is converted, but, except as
> provided in subsections (b) and (c) of this section, does not effect a
> change in the date of the filing of the petition, the commencement of
> the case for the order for relief.

11 U.S.C. § 348(a).  In *In re Manson Billard*, the court applied Section 348(a) in a situation similar

to the present case in which an involuntary Chapter 7 petition was converted to a Chapter 11 petition

by the debtor.  *Manson Billard, Inc. v. Hoffman Indus., Inc.* (*In re Manson Billard, Inc.*), 82 B.R.

769, 773 (Bankr. E.D. Pa. 1988).

> The term 'petition' as used in this section includes the date
> of the filing of an involuntary, which 'commences' a case.
> 11 U.S.C. § 101(36). Thus, read together, § 101(36) and § 348(a)
> suggest that debtors' decision to convert did not change the date of

25

filing or the date of commencement, both of which were the date on
which the involuntary was filed.

*Id.* In light of this, the petition date is the date on which the involuntary petition was filed, or in this

case, April 20, 2004.

Furthermore, two lease provisions exist in the present case which indicate that Pelican's

obligation to pay CAM and RET reconciliation charges arose upon receipt of a reconciliatory bill

from the Landlord. Pursuant to paragraphs 2G and 5.08 of the Modified Lease, the 2004 CAM and

RET year-end reconciliation charges were billed post-petition. In addition, both the monthly CAM

charges billed in 2006 as well as the 2005 CAM and RET year-end reconciliation charges were also

billed post-petition. Therefore, following *Montgomery Ward*, the Landlord is entitled to an allowance

of its Chapter 11 administrative expenses as a matter of law.

With regards to the priority of the Landlord's Chapter 11 administrative expense claim,

Section 726(b) of the Bankruptcy Code is clear in requiring that the administrative expenses incurred

in a subsequent Chapter 7 proceeding take priority over Chapter 11 administrative expenses.

Specifically, the provision provides that claims allowed under Section 503(b) and which were

incurred under Chapter 11 are subordinate to claims allowed under section 503(b) in Chapter 7 due

to subsequent conversion. *See* 11 U.S.C. § 726(b). The Trustee claims that he does not know

whether funds are available to pay all classes of creditors and thus should not be compelled to expend

any funds until he obtains this information. This Court concludes that there is no genuine issue of

material fact with respect to the Landlord's entitlement to an allowance of a Chapter 11

administrative claim payable in accordance with the priority scheme set forth in the Bankruptcy

Code.  Payment should be made by the Trustee of Chapter 11 administrative expenses, if funds are

available, as soon as practicable.

**VI.     Attorney's Fees as an Administrative Expense**

The Landlord argues that the provisions of the Modified Lease entitle it to an award of

reasonable attorney's fees which were incurred through the Landlord's efforts to enforce obligations

under the lease.  Indeed, paragraph 16.02(b) of the lease as modified states that the occurrence of

default will be treated as a breach of the lease agreement, thereby giving the Landlord the right to

bring suit for the collection of both rent and damages, including reasonable attorney's fees.

Accordingly, the Landlord seeks payment of the attorney's fees it incurred both pre- and

post-rejection.

Thus, the first question at issue is whether attorney's fees can be considered an "obligation"

under Section 365(d)(3) so as to warrant the immediate payment of such fees to the Landlord.  A

significant number of courts have determined that a landlord is entitled to fees incurred in connection

with administrative rent if authorized by the terms of the lease.  *See, e.g.*, *Geonex*, 258 B.R. at 341;

*In re Exchange Res., Inc.*, 214 B.R. 366, 369 (Bankr. D. Minn. 1997); *In re MS Freight Distribution,

Inc.*, 172 B.R. at 978.  As a basis for this conclusion, these courts point to the language and legislative

history of Section 365(d)(3), both of which demonstrate Congress's clear intent to enable landlords

to be fully paid during the first sixty days of a case while a trustee decides whether to assume or

reject a lease.  *E.g.*, *Geonex*, 258 B.R. at 341.  Indeed, the words, "all obligations" in the provision

means that, to the extent a lease requires payment of attorney's fees and costs, a lessor may recover

these amounts.  *Id.*; *In re MS Freight Distribution, Inc.*, 172 B.R. at 978.

27

Courts which have disagreed with this stance have done so primarily for three reasons: (i) a

belief that Section 365(d) departs from the standard priority scheme of the Bankruptcy Code and thus

should not be held to mandate payment of a claim under a lease provision, *Omni Partners, L.P. v.*

*Pudgie's Dev. of N.Y., Inc.* (*In re Pudgie's Dev. of N.Y., Inc.*), 202 B.R. 832, 836 (S.D.N.Y. 1999);

(ii) the notion that lease provisions allowing a landlord to recover attorney's fees are actions under

state law, *In re Ryan's Subs, Inc.*, 165 B.R. 465, 468 (Bankr. W.D. Mo. 1994); and (iii) a belief that

an obligation to reimburse attorney fees under a pre-petition lease does not arise "from and after the

order for relief," *In re Pac. Arts Publ'g, Inc.*, 198 B.R. 319, 324 (Bankr. C.D. Cal. 1996).

The Third Circuit reasoning applied in *Montgomery Ward* provides considerable direction in

resolving this issue.   In *Montgomery Ward*, the Court, in discussing Section 365(d)(3) of the

Bankruptcy Code, stated that:

> clear and express intent of Section 365(d)(3) is to require the trustee
> to perform the lease in accordance with its terms. . . .  In the context
> of a lease contract, it seems to us that the most straightforward
> understanding of an obligation is something that one is legally
> required to perform under the terms of the lease and that such an
> obligation arises when one becomes legally obligated to perform.

*Montgomery Ward*, 268 F.3d at 209. Finding it to be consistent with *Montgomery Ward*'s reading

of Section 365(d)(3), specifically with respect to that Court's stance on what constitutes an

"obligation" under the provision, this Court concludes that, where authorized by a provision in the

lease enforceable under state law, a landlord is entitled to attorney's fees when such fees are

reasonably incurred for the purpose of enforcing performance under the lease.

A claim for attorney's fees pursuant to a contractual agreement is not an award of costs, but

rather an element of damages which must be proven. *Belfer v. Merling*, 730 A.2d 434, 443 (N.J.

Super. Ct. App. Div. 1999).  Indeed, when a court enforces an agreement and awards the actual,

28

reasonable, and necessary expenses of the aggrieved party in maintaining the action as part of his or

her general damages, the court is merely adjudicating damages for breach of contract. *Id.* Moreover,

a fee award is limited to those charges that are reasonable under the circumstances. *See N. Bergen*

*Rex Transp., Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 848 (N.J. 1999).

As a result, with respect to the pre-rejection attorney's fees, because the Modified Lease

provides for attorney's fees and is enforceable under state law, the Landlord is entitled to

pre-rejection attorney's fees pursuant to Section 365(d)(3) as a matter of law pending the court's

determination of the reasonableness of such fees.[9]  In the present case, the Trustee has noted that the

certification provided by the Landlord's attorney is missing certain details which are necessary to

support the payment of attorney's fees, such as the novelty and difficulty involved in the work, the

time and labor required, and the billing rate of the Landlord's attorney.  Accordingly, the Landlord's

counsel is to submit a certification of fees relating solely to the enforcement of pre-rejection

obligations within twenty (20) days.

In order to be accorded priority as an administrative expense for post-rejection attorney's fees

pursuant to Section 503(b)(1)(A): (i) the claim must arise from a transaction with the debtor; and

(ii) consideration supporting claimant's right to payment must have been supplied to and been a

benefit to the debtor's estate.  *E.g.*, *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 532-33 (3d Cir.

1999).  This Court cannot determine whether either criterion for administrative expense priority is

---

[9]  The Trustee appears to argue in its brief that unless the alleged attorney's fees are the result of willful non-compliance with the lease provision, the Landlord is entitled to those fees.  While willful non-compliance is certainly a basis for awarding fees, it is not a requirement.  Indeed, attorney's fees will generally not be awarded in a federal action unless: (i) a contract expressly provides for payment; (ii) a statute expressly provides for the payment of attorney's fees; (iii) a "common benefit" is conferred by the recovery of a fund or property; (iv) a party willfully disobeyed a court order; or (v) the court finds that the losing party has acted in bad faith.  *Cityside Archives, Ltd. v. New York City Health and Hosp. Corp.*, 37 F. Supp. 2d 652, 656-57 (D.N.J. 1999) (applying New Jersey law).  Thus, the fact that the present case constituted a good faith dispute regarding lease provisions rather than a case marked by willful non-compliance is not dispositive of the issue.

satisfied until the issue of whether Pelican remained in possession of the premises following the lease rejection date is resolved. Accordingly, summary judgment is denied as to the post-rejection attorney's fees claim.

### Conclusion

For the aforementioned reasons, this Court holds that: (i) Pelican's *pro rata* share of CAM charges under the Modified Lease is to be calculated at 25.5842%; (ii) the shelving remaining on the premises following the effective date of rejection is a fixture belonging to the Landlord; (iii) the Landlord shall be paid rent, RET, and CAM charges calculated at 25.5842% as part of its Chapter 7 administrative expenses; (iv) the Landlord shall be paid interest on its post-petition, pre-rejection lease obligations pursuant to Section 365(d)(3); (v) the Landlord shall not be entitled to interest accruing post-rejection on its unpaid lease obligations; (vi) the Landlord shall be entitled to an allowance of its Chapter 11 administrative expenses in full under Section 503(b) but payment is not to be made until and unless all payments entitled to priority under Section 503(b) have been paid; (vii) the Landlord is entitled to post-petition, pre-rejection attorney's fees pursuant to Section 365(d)(3) as a matter of law, pending the court's determination of the reasonableness of such fees, with a certification of such fees to be submitted within twenty (20) days; and (viii) the balance of both motions for summary judgment is hereby denied.

An Order in conformance with this Opinion has been entered by the Court and a copy is attached.

s/  *Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: July 27, 2009